517 P.2d 1089

**WATKINS CIGARETTE SERVICE, INC., an Arizona corporation, and Valley Vendors, an Arizona, corporation, Appellants,**

v.

**ARIZONA STATE TAX COMMISSION, a body corporate and politic, and L. Waldo DeWitt, Chairman, and John M. Hazelett and Robert A. Kennedy, as members of and constituting said Arizona State Tax Commission, Appellees.**

No. 1 CA–CIV 1801.

Court of Appeals of Arizona, Division 1, Department B.

Jan. 15, 1974.

Rehearing Denied March 4, 1974.

Review Granted March 26, 1974.

Richmond, Ajamie, Fay & Warner by Jack C. Warner, Phoenix, for appellant Watkins Cigarette Service, Inc.

Powers, Boutell, Fannin & Kurn, P. A. by William T. Boutell, Jr., Phoenix, for appellant Valley Vendors.

Gary K. Nelson, Atty. Gen., by James D. Winter, Asst. Atty. Gen., Phoenix, for appellees.

## OPINION

JACOBSON, Chief Judge.

The sole issue on this appeal from two superior court judgments is whether the amount of the "Luxury Privilege Tax" imposed by A.R.S. §§ 42–1204 and 42–1231.A is to be included in the tax base for the purpose of determining the amount of the seller's "Transaction Privilege Tax" levied by A.R.S. § 42–1309. Stating this issue in more colloquial language, it is simply whether the State "cigarette tax" of ten cents per package is to be included in determining the amount of the seller's State "sales tax" liability.[1]

---

1. As discussed *infra,* the quoted terms are not technically correct because of the nature of these two taxes, but they do perhaps serve to call attention to the heart of the problem.

The judgments appealed from were entered in two similar actions, one brought by each appellant, to recover a refund of transaction privilege taxes paid to appellee Arizona State Tax Commission (Commission) under protest, which were consolidated in the trial court. Both appellants and the Commission moved for summary judgment on the basis of a stipulation that the facts pleaded in the complaints were deemed admitted for purposes of the *motions*. There being no issues of fact, the trial court determined that the Commission was entitled to judgment as a matter of law, and entered a judgment accordingly in each case.

The stipulated facts reveal the following situation. The appellants, Watkins Cigarette Service and Valley Vendors are each in the business of selling cigarettes at retail through vending machines. Each purchases the required luxury tax stamps from appellee, affixes them to the cigarette packages and posts a price breakdown on each vending machine which shows that the total cost of the cigarettes includes ten cents per package for the state luxury tax.

In computing its state transaction privilege tax, each appellant deducted from its tax base the amount of the luxury tax, or, in other words, appellants have excluded from their gross receipts the amount of the luxury tax collected. For the tax periods in question, the Commission assessed against each appellant an additional amount of transaction privilege tax equal to three percent (the applicable transaction privilege tax rate here) of the luxury privilege tax which had been deducted from appellants gross receipts. Appellants, after exhausting their administrative remedies, paid these additional assessments under protest and commenced the instant tax refund suits. The trial court's summary judgments in favor of the Commission determined that the additional taxes were properly assessed and that appellants were not entitled to any refunds.

The Luxury Privilege Tax Act, A.R.S. §§ 42–1201 to 42–1231, contains no specific provisions relating to the inclusion or exclusion of that tax in computing the transaction privilege tax, although § 42–1204 thereof does provide that the luxury privilege tax is levied and imposed in addition to all other taxes. The Transaction Privilege Tax Act, A.R.S. §§ 42–1301 to 42–1425, imposes a separate basic tax which is described as a privilege tax "measured by the amount or volume of business transacted by persons on account of their business activities, and in the amounts to be determined by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, in accordance with the schedule as set forth in §§ 42–1310 through 42–1315." A.R.S. § 42–1309 (In this case a tax of 2%). A supplementary tax ("Education Excise Tax") at the rate of 1% is also imposed "[o]n the privilege of doing business in this state, measured by the amount or volume of business transacted by persons on account of their business activities, and in the amounts to be determined by the application [of such rates] against values, gross proceeds of sales or gross income, as the case may be . . . ." A.R.S. § 42–1361.A.1. In view of the identity of language and operation of the basic and supplementary taxes, there is no need to treat them separately, and both such taxes are referred to hereinafter as the transaction privilege tax with a rate of 3%. Transaction privilege tax act defines "gross proceeds of sales" as "the value proceeding or accruing from the sale of tangible personal property without any deduction on account of the cost of property sold, expense of any kind, or losses, but cash discounts allowed and taken on sales shall not be included as gross income." A.R.S. § 42–1301.7.

Likewise, "gross income" is defined as "the gross receipts of a taxpayer derived from trade, business, commerce or sales and the value proceeding or accruing from the sale of tangible personal property, or service, or both, and without any deduction on account of losses." A.R.S. § 42–1301.6.

" 'Gross receipts' means the total amount of the sale . . . price . . . of the

retail sales of retailers . . . valued in money . . . including all receipts . . . of every kind or nature, . . . without any deduction therefrom on account of the cost of the property sold, materials used, labor or service performed, interest paid, losses or any other expense. . . ." A.R.S. § 42–1301.9.

Under these statutes, the Commission takes the position that the amount of the luxury privilege tax is to be included in appellants' "gross proceeds of sales or gross income from the business", and therefore appellants improperly deducted the amount of this luxury tax in determining the amount of their transaction privilege tax liability.

The stance assumed by the Commission is grounded upon two Arizona Supreme Court decisions, one entered in 1936 and the other in 1951. The first of these, which lays the premises for the Commission's position is Stults Eagle Drug Co. v. Luke, 48 Ariz. 467, 62 P.2d 1126 (1936). In *Stults Eagle,* the Arizona Supreme Court was called upon to pass on the constitutionality of the then newly passed (1935) "Luxury Tax" (ACA § 74–1401 et seq. 1939). In upholding the constitutionality of the "luxury tax", the Court stated that:

"The whole context of the act shows that its purpose is to impose a tax on the act of selling the luxuries to the customers for consumption *and not on the thing sold.* (emphasis supplied)

\*　　\*　　\*　　\*　　\*　　\*

"Thus the tax is designated a *sales tax* and the right purchased by the tax is 'the privilege of engaging in' the business of selling the luxuries named. (emphasis in original)

\*　　\*　　\*　　\*　　\*　　\*

"The tax is not laid on the person, as is a capitation tax, nor is it laid upon the luxury goods, but upon their sale. It must be then an excise tax . . . ." 48 Ariz. at 472, 474, 475, 62 P.2d at 1128, 1129, 1130.

With this characterization of the luxury tax as being a tax on the privilege of doing business in luxuries, and the incidence of the tax not being on the luxury itself, the Commission logically argues that this case is controlled by the 1951 decision of State Tax Commission v. Quebedeaux Chevrolet, 71 Ariz. 280, 226 P.2d 549 (1951). In *Quebedeaux,* the Arizona Supreme Court was faced with the question of whether the transaction privilege tax which was separately billed and collected from the consumer was to be included within the gross income of the retailer for purposes of determining the retailer's ultimate transaction privilege tax liability. In holding that the tax collected from the consumer was to be included in the base for determining the ultimate tax liability, the court stated:

"*Each item considered in setting the ultimate selling price, including the tax now in question, is paid by the consumer solely to get the goods.* The tax therefore is part of the purchase price, and this price which is paid to get the goods which plaintiff does sell constitutes gross income on each transaction. The Act provides that the 'gross proceeds of sales or gross income from the business' . . . is the base by which the 2% tax is measured. The tax therefore is a part of the selling price which forms the base upon which the amount of the tax is levied." 71 Ariz. 280, 284–285, 226 P. 2d 549, 552. (Emphasis in original.)

The *Quebedeaux* court reinforced its decision by analyzing the legislative intent in enacting the transaction privilege tax as follows:

"Here, the intent of the legislature as expressed in the title of the Act as originally enacted, is again affirmed. Construing the Act as a whole, which we must do . . . . we believe it is manifest that the intent of the legislature was . . . that the Act in its harmonious whole leaves no doubt that the 'gross proceeds of sales' and 'gross income' subject to taxation include all sums re-

ceived by retailers, *including the 2% tax passed on to the buyer as part of the purchase price.*" Id. at 286, 226 P.2d at 553. (emphasis in original)

The court then summarized its holding by stating:

"In conclusion we hold: (1) that the Act does not impose a tax upon the purchaser nor upon sales, but rather places a tax upon the seller for the privilege of engaging in business and fixes the gross income from sales as the base for computing the tax, Arizona State Tax Comm. v. Frank Harmonson Co., 63 Ariz. 452, 163 P.2d 667; White v. Moore, 46 Ariz. 48, 46 P.2d 1077; (2) that the Act makes the tax the direct obligation of the retailer and not that of the consumer; (3) that there is no statutory authority for the retailer attempting to constitute himself a mere collector or agent of the state for the purpose of receiving same and transmitting it to the commission; (4) that the terms 'gross proceeds of sales' or 'gross income from the business' upon which the tax is based includes any and all sums received, regardless of whether or not the retailer separately bills to his customers the privilege tax he is passing on to them, and whether or not he segregates the amounts thus received." Id. at 289, 226 P.2d at 555.

The Commission argues that there is no logical distinction between the luxury tax involved in this case and the transaction privilege tax involved in *Quebedeaux*—both being a tax on the privilege of engaging in a particular activity—and therefore the rationale of *Quebedeaux* must apply and the trial court must be affirmed.

To determine the validity of this argument we are required to ascertain whether, in the words of *Quebedeaux*, "the legislature meant by its all inclusive language to include within the tax base *all amounts* received in return for tangible personal property sold" including luxury taxes paid by the consumer. To assist in this determina-

tion we are of the opinion that the following factors are relevant.

In view of our position as an intermediate appellate court we cannot change the characterization placed by the Arizona Supreme Court in *Stults Eagle* on the luxury tax as a transaction privilege tax. We do note, however, that the *Stults* court, somewhat inconsistent with its holding that the tax involved is a transaction privilege tax, states that "[t]he merchant dealing in luxuries is, in effect, constituted a tax collector for the state . . . ." Therefore, the distinction made in *Quebedeaux*, that a transaction privilege taxpayer is not a tax collector, does not hold true as to a luxury taxpayer.

We also note that the legislature initially enacted the luxury tax and the transaction privilege tax at the same time in 1935 and is part of a general revenue raising measure. It would therefore appear, at least initially, that the same legislature was working on the same bill at the same time and if the results urged by the commission was intended, an opportunity was certainly present to effect it.

We also note, following the decision in *Quebedeaux,* the legislature immediately in 1952 amended the transaction privilege tax section by specifically providing that "gross receipts or gross proceeds of sales shall be deemed to be the amount received, *exclusive of the tax imposed by* [this article]" ACA 73–1302 a. (1954 Supp.) (1939) (now A.R.S. § 42–1302), thus nullifying the specific holding of the *Quebedeaux* case. Such immediate action by the legislature raises an arguable inference that the legislature had not intended the *Quebedeaux* result.

We further note that between 1935, the time of the initial enactment of the luxury tax and transaction privilege tax, and September, 1969, the Commission took no steps to include the luxury tax receipts of a taxpayer within the tax base for computing transaction privilege tax liability. This was first precipitated by adoption of a regulation of the State Tax Commission on

December 26, 1965, which provides in pertinent part:

"State . . . luxury taxes on cigarettes . . . are not deductible from gross income or gross proceeds of sale." [State Tax Commission Regulations] Title 41 State Tax Commission, Art. II, Combined Transaction Privilege (Sales) and Use Tax, Regulation 2.17.2 (o), (June 28, 1966).

■ While administrative interpretation of a statute is not binding on the court, the construction placed on a statute by the executive body which administers it, especially if acquiesced in for a long period of time, is entitled to great weight in arriving at a proper construction. Police Pension Board of City of Phoenix v. Warren, 97 Ariz. 180, 398 P.2d 892 (1965), rehearing denied, 97 Ariz. 301, 400 P.2d 105 (1965); City of Mesa v. Killingsworth, 96 Ariz. 290, 394 P.2d 410 (1964).

Finally and most importantly, we note that the legislation involving the luxury tax as initially enacted mandated that the luxury tax stamps which were required to be purchased and placed on the commodity sold thus evidencing the payment of the tax, were to be purchased by wholesalers or retailers "at the face price thereof." ACA § 73–1403 (1939). In 1945, this section was amended to provide that these luxury tax stamps were to be purchased by the wholesaler or retailer "at ninety-five per cent [95%]" ACA § 73–1403 (1939), as amended, Laws, 1945, Ch. 51, § 1, p. 132. Thus it appears that the "tax collector" status of the merchant noted in *Stults Eagle* was changed from an uncompensated collector to a compensated collector. This percentage of cost of stamps insofar as cigarette luxury stamps are concerned was raised to 98.5% face value of the stamps in 1965. A.R.S. § 42–1207, as amended, Laws of 1965, 3rd S. S., Ch. 2, § 1.

The question that is immediately raised is whether the legislature intended that the compensation that the wholesaler or retailer is to receive for handling the tax monies, affixing the stamps, filing reports, etc.

(now 1.5% of the total luxury tax ultimately collected) is to be taken away and a charge of 1.5% added thereto by imposing a 3% tax on the luxury tax collected. This may be illustrated by the following example: Assume that a retailer collects $1,000 in luxury taxes during a given year. Under A.R.S. § 42–1207, the stamps necessary to raise this amount of revenue cost the retailer only $985. Thus he is being compensated in the sum of $15.00 for his tax collection efforts done on behalf of the state. If the $1,000 luxury tax collected by the retailer is included in his tax base for purposes of figuring his transaction privilege tax liability, the retailer is paying $30 in additional taxes on this amount. ($1,000 X .03 = $30.00). He therefore is paying in taxes on the amount collected, twice as much as he received in compensation for collecting the tax.

■ To construe A.R.S. § 42–1301 defining "gross income" and "gross proceeds of sale" as including sums received by a retailer for luxury taxes would in essence nullify A.R.S. § 42–1207 providing compensation to the retailer for his efforts in collecting the tax. In our opinion, the legislature could not have intended such a result. We are mindful that in construing legislation where statutes *in pari materia* are in apparent conflict they must, if possible, be construed in harmony so as to give force and effect to each. State Land Department v. Tucson Rock & Sand Co., 107 Ariz. 74, 481 P.2d 867 (1971).

■ In view of the simultaneous enactment of these two taxes, the amendments to the luxury tax statute following the *Stults Eagle* case making the merchant a compensated tax collector, the immediate amendment of the transaction privilege tax to nullify the holding in the *Quebedeaux* case, and the 30-year acquiescence by the Commission in excluding the luxury tax from the privilege transaction tax base, the Commission being charged with the enforcement of the act, we are of the opinion that the legislature intended the luxury tax to be excluded from "gross proceeds of

**202**

sale" under the transaction privilege tax (A.R.S. § 42–1301).

We admit that the position of the Commission under *Stults Eagle* and *Quebedeaux* is logically supportable. However, in view of the history of these taxes, we are drawn to the inescapable conclusion that such a result was never intended by the legislature. If we are mistaken in our assessment of this intent, the legislature can and will point out our mistake as they did following the *Quebedeaux* decision.

For the foregoing reasons, the judgment of the trial court is reversed and the matter remanded with directions to enter judgment in favor of the two taxpayers involved.

HAIRE, P. J., concurs.

EUBANK, Judge (dissenting).

I must dissent from the majority opinion since, in my opinion, the transaction privilege tax statutes, A.R.S. § 42–1301 et seq., clearly require the result reached by the trial court in its judgment in favor of the appellees. These statutes are not so vague, uncertain or ambiguous as to require the statutory construction relied on in the majority opinion.

A.R.S. § 42–1309.A. states that the Transaction Privilege Tax,

". . . is levied and there shall be collected by the commission . . . privilege taxes measured by the amount or volume of business transacted by persons on account of their business activities, and in the amounts to be determined by the application of rates against values, *gross proceeds of sales,* or *gross income,* . . . ." (Emphasis added).

It is clear from the evidence that the appellants collected the "Luxury Privilege Tax" (A.R.S. § 42–1201 et seq.) as a part of their "gross income" or "gross proceeds of sales" as specifically defined by A.R.S. § 42–1301(5) and A.R.S. § 42–1301(6). The Supreme Court has held that the incidence of the "Luxury Privilege Tax" rests on the person engaged in the business of selling specified luxuries and is paid to the

state for the privilege of engaging in the sales of luxury goods. *Stults Eagle Drug Co. v. Luke,* 48 Ariz. 467, 62 P.2d 1126 (1936). The Supreme Court has also held that the transaction privilege tax itself, when passed on to a customer by the retailer, constitutes a part of the retailer's "gross income" or "gross proceeds of sales". *State Tax Commission v. Quebedeaux Chevrolet,* 71 Ariz. 280, 226 P.2d 549 (1951).

Based upon the foregoing authorities, it is my opinion that the Luxury Privilege Tax, collected from the customers as a part of the retailer's sale price of cigarettes, became a part of the retailer's "gross income" and "gross proceeds of sales", as defined by A.R.S. § 42–1301, and therefore became subject to the transaction privilege tax, as provided in A.R.S. § 42–1309.A., supra. I would affirm the judgment of the trial court.